IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEVEN B.,[1]

                 Plaintiff,

       v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

                 Defendant.

Case No. 2:24-cv-01907-SB

**OPINION AND ORDER**

---

**BECKERMAN, U.S. Magistrate Judge.**

     Steven B. ("Plaintiff") filed this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of his application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act. The Court has jurisdiction over this matter pursuant to

42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons explained below, the Court affirms the

Commissioner's decision because it is free of harmful legal error and supported by substantial

evidence.

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party.

PAGE 1 – OPINION AND ORDER

## STANDARD OF REVIEW

"As with other agency decisions, federal court review of social security determinations is limited." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). That is because "[f]or highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)). Adhering to this principle, courts "follow three important rules" in reviewing social security determinations. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

First, courts "leave it to the [agency] to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id.* (quoting *Treichler*, 775 F.3d at 1098). Second, courts "will 'disturb the Commissioner's decision to deny benefits only if it is not supported by substantial evidence or is based on legal error.'" *Id.* (quoting *Treichler*, 775 F.3d at 1098). Third, if the agency "'commits legal error, [courts] uphold the decision where that error is harmless,' meaning that 'it is inconsequential to the ultimate nondisability determination,' or that, despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'" *Id.* (quoting *Treichler*, 775 F.3d at 1098); *see also Smith v. Kijakazi*, 14 F.4th 1108, 1111 (9th Cir. 2021) ("And even where this modest [substantial evidence] burden is not met, [courts] will not reverse an [agency] decision where the error was harmless." (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), *superseded on other grounds by regulation as recognized in Farlow v. Kijakazi*, 53 F.4th 485, 487 (9th Cir. 2022))).

///

///

# BACKGROUND

## I.     PLAINTIFF'S APPLICATION

Plaintiff was forty-two years old on his alleged disability onset date of September 10, 2020.[2] (Tr. 15, 37.) He had at least a high school education, but no past relevant work experience. (*Id.* at 37.) In his application, Plaintiff alleged disability due to Bipolar Type I with psychotic features and post-traumatic stress disorder ("PTSD"). (*Id.* at 335.) The Commissioner denied Plaintiff's application initially on July 5, 2023, and upon reconsideration on October 10, 2023. (*Id.* at 170-79, 181-88.)

On December 12, 2023, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 191.) Plaintiff and a vocational expert ("VE") testified at an administrative hearing on June 5, 2024. (*Id.* at 53-83.) On July 29, 2024, the ALJ issued a written decision denying Plaintiff's application. (*Id.* at 15-39.) On September 17, 2024, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (*Id.* at 1-6.) Plaintiff now seeks judicial review of the ALJ's decision.[3]

---

[2] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 1:07-cv-01016 TAG, 2008 WL 4490024, at *4 (E.D. Cal. Sept. 30, 2008) (citation omitted). Workers accumulate quarters of coverage based on their earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty-quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citation omitted). Thus, Plaintiff's date last insured ("DLI") of March 31, 2021 (Tr. 19) reflects the date on which his insured status terminated based on the previous accumulation of quarters of coverage. If Plaintiff established that he was disabled on or before March 31, 2021, he is entitled to DIB. *See Truelsen v. Comm'r of Soc. Sec.*, No. 2:15-cv-2386-KJN, 2016 WL 4494471, at *1 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998))).

[3] The record reflects two prior unfavorable ALJ decisions—the first issued on December 5, 2016, and the second issued on September 3, 2020. (*Id.* at 84-104, 109-131.) The Appeals Council denied Plaintiff's request for review on each case on March 28, 2017, and October 27,

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 724-25.

The claimant bears the burden of proof for the first four steps. *See Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *See id.* at 954. The Commissioner bears the burden of proof at step five, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *See Bustamante*, 262 F.3d at 954.

///

2020, respectively. (*Id.* at 105-08, 132-37.) Plaintiff did not seek judicial review of either decision.

"When a claimant has a history of substance abuse, the ALJ is required to include an extra analysis in reaching the determination of disability." *Bowman v. Kijakazi*, No. CV 21-42-BLG-TJC, 2022 WL 22285921, at *3 (D. Mont. Sept. 29, 2022). "The ALJ must 'apply the [five-step] sequential evaluation process twice.'" *Id.* (citing Social Security Ruling ("SSR") 13-2p, 2013 WL 603764 (Feb. 20, 2013)); *see also Sousa v. Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998) (noting that under the relevant Social Security Administration ("SSA") regulations, the ALJ is required to consider as a "key factor" to the materiality of any drug addiction or alcoholism "whether an individual would still be found disabled if [he] stopped using alcohol or drugs" (citing 20 C.F.R. § 404.1535(b)(1)); *see also* SSR 13-2p, 2013 WL 603764 ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find a claimant disabled if he or she stopped using drugs or alcohol.").

The ALJ is first required to conduct the sequential five-step inquiry "without separating out the impact of alcoholism or drug addiction." *Bustamante*, 262 F.3d at 955. If the ALJ finds that the claimant is disabled and there is medical evidence of alcoholism or drug addiction, the ALJ is then required to conduct the sequential five-step inquiry for a second time, separating out any impact of the alcoholism or drug addiction to determine whether those conditions are a contributing factor that is material to the determination of disability. *See id.* (first citing 20 C.F.R. § 404.1535; and then citing 20 C.F.R. § 416.935). The burden of proof is on the claimant to establish that alcoholism or drug addiction is not material to the disability claim. *See Parra v. Astrue*, 481 F.3d 742, 748-49 (9th Cir. 2007) ("We thus make explicit what was intimated by our earlier cases, that the claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material to his disability."). If the drug and alcohol analysis applies, claimants

"must be given an opportunity to present evidence as to whether their disability would have remained if they stopped using drugs and alcohol." *Sousa*, 143 F.3d at 1245.

## III.    THE ALJ'S DECISION

The ALJ analyzed Plaintiff's claim for benefits under the process described above. (Tr. 15-39.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 10, 2020, the alleged onset date. (*Id.* at 19.) At step two, the ALJ found that Plaintiff suffered from the following severe medically determinable impairments: polysubstance abuse (alcohol and drugs) (material to disability), bipolar disorder, and PTSD. (*Id.*)

Because alcohol and drug abuse were relevant to the ALJ's disability determination, the ALJ first conducted the five-step inquiry without separating out the impact of Plaintiff's substance use. The ALJ determined that considering Plaintiff's substance use, his impairments met section 12.04 in the Listing of Impairments. (*Id.* at 21, citing 20 C.F.R. §§ 404.1520(d) and 404.1525.) The ALJ then concluded that if Plaintiff *stopped* using substances, he would still have a severe impairment or combination of impairments, but he would no longer have an impairment or combination of impairments that meets or equals the criteria for any impairment found in the Listing of Impairments. (*Id.* at 28.) The ALJ then analyzed Plaintiff's residual functional capacity ("RFC") and found that if Plaintiff stopped using substances, he would have the RFC to perform the full range of work at all exertional levels with some exertional, manipulative, environmental, and mental restrictions. (*See id.* at 31.) Specifically, Plaintiff could perform "simple, routine, and repetitive tasks with no production pace or conveyor belt (non-worker[-]controlled pace) with a predictable work environment and only occasional simple workplace changes." (*Id.*) He also "would have needed to avoid jobs where interacting with the public was

part of the job" but "could have had occasional and brief interaction with co-workers but no team or tandem work, and occasional interaction with supervisors." (*Id*.)

At step four, the ALJ found that Plaintiff had no past relevant work. (*Id*. at 37.) At step five, the ALJ found, based on the VE's testimony, that considering his age, education, work experience, and RFC, Plaintiff could work as a janitor, hand packager, or automobile detailer, if he stopped using substances. (*Id*. at 38.) The ALJ concluded that Plaintiff's substance use disorder is a "contributing factor material to the determination of disability because [he] would not be disabled if he stopped the substance use," and therefore Plaintiff was not disabled under the Social Security Act. (*Id*. at 38-39.)

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to conduct an adequate analysis in the absence of substance use at step three; (2) failing properly to evaluate the medical opinion evidence from Joel Rice, M.D. ("Dr. Rice"); (3) improperly discounting Plaintiff's subjective symptom testimony; and (4) failing to conduct a proper evaluation at step five. (Pl.'s Opening Br. ("Pl.'s Br.") at 2-20, ECF No. 16.) As explained below, the Court concludes that the Commissioner's decision is free of harmful legal error and supported by substantial evidence.

## I.    STEP THREE

Plaintiff argues that the ALJ erred by failing to conduct an adequate step three analysis in the absence of substance use with respect to Listings 12.04 (Depressive, bipolar and related disorders) and 12.15 (Trauma and stressor-related disorders). (Pl.'s Br. at 13-14.) Specifically, Plaintiff takes issue with the ALJ's evaluation of a treatment note from November 13, 2020, reflecting that Plaintiff was experiencing psychosis during a session with a clinical social worker. (*Id*., citing *id*. at 25, 2056-57.) Plaintiff argues that this treatment note is evidence of the severity

of his mental health impairments because there was "no indication that [he] was using substances at that time" and the ALJ "fault[ed] him for requesting more Seroquel medication[.]" (*Id.* at 13.)

### A.    Applicable Law

At step three of the sequential evaluation process, the ALJ must determine whether the claimant's impairments meet or equal a listed impairment. *See Keyser*, 648 F.3d at 724. Plaintiff bears the burden of proof at step three. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").

To meet a listing, an impairment "must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment[.]" *Tackett*, 180 F.3d at 1099; *see also Sullivan*, 493 U.S. at 531 (to establish equivalency, the claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment") (citation omitted); *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013) (finding that listed impairments contain "strict standards because they automatically end the five-step inquiry, before residual functional capacity is even considered").

"To show error in an ALJ's [s]tep [t]hree finding, a claimant bears the burden to 'specify which listing she believes she meets or equals,' and then 'set forth [] evidence which would support the diagnosis and findings of a listed impairment.'" *Daly v. Bisignano*, No. 24-4888, 2025 WL 3187349, at *1 (9th Cir. Nov. 14, 2025) (quoting *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005)).

///

///

### B.     Analysis

The Court concludes that the ALJ did not err in finding that Plaintiff would not meet or equal Listings 12.04 or 12.15 if he stopped using substances.

#### 1.     The ALJ's Findings

The ALJ found that when Plaintiff's substance use is considered, the severity of his impairments meets the criteria of section 12.04 of 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Subpart P, Appendix 1. (*See* Tr. 21, citing 20 C.F.R. §§ 404.1520(d) and 404.1525.) Specifically, the ALJ found that both paragraphs A and B criteria were satisfied. (*Id*. at 22.)

The ALJ explained that Plaintiff satisfied paragraph A's criteria because Plaintiff "had, among other things, a bipolar disorder with pressured speech, flight of ideas, distractibility, and involvement in activities that had a high probability of painful consequences that were not recognized." (*Id*.) Plaintiff satisfied paragraph B's criteria because "with substance abuse, [Plaintiff]'s impairments caused a marked limitation in understanding, remembering, or applying information, a marked limitation in interacting with others, a marked limitation in concentrating, persisting, or maintaining pace, and a marked limitation in adapting or managing oneself." (*Id*.) However, the "severity of [Plaintiff]'s mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.15 if the substance use was stopped." (*Id*. at 29.)

#### 2.     Disposition

The ALJ appropriately evaluated Plaintiff's ability to meet Listings 12.04 and 12.15 with and without substance use.

##### a.     Paragraph B Criteria

Listings 12.04 and 12.15 require satisfaction of the paragraph B criteria, which requires either an extreme limitation of one or a marked limitation of two of the following areas of mental

functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Subpt. P, App 1. Listing 12.00. The ALJ determined that without substance use, Plaintiff was only "moderately" limited in each of these four areas of mental functioning and thus he no longer met the criteria for Listings 12.04 or 12.15. (Tr. 29-31.)

Plaintiff argues that he meets both listings without substance use because the record demonstrates that he "requires a controlled stress-free environment, must isolate and avoid others, and would quickly decompensate into an episode of psychosis with the increased stress of employment, thus establishing the paragraph 'C' criteria." (Pl.'s Br. at 14, citing Tr. 62-74, 2636-39.) Plaintiff does not address the fact that the ALJ provided a detailed analysis of each of the paragraph B criteria.

The ALJ offered more than a boilerplate step three finding as to the paragraph B criteria for Listings 12.04 and 12.15. (*See* Tr. 29-31.) For example, with respect to Plaintiff's ability to understand, remember, or apply information, the ALJ cited several treatment notes reflecting improved cognitive abilities when Plaintiff stopped or reduced substance use and complied with treatment. (*Id.*) The ALJ acknowledged that "[Plaintiff's] cognitive abilities did deteriorate sometimes with substance abuse and[] other significant treatment noncompliance (such as not taking medications appropriately)" but "with stopping [or] reducing substance use, and[] with better treatment compliance in general, he showed improved cognitive abilities." (*Id.* at 29, citing *id.* at 1602-03, 1908, 2091-92, 2269.) The ALJ also cited a treatment note from mid-February 2020, noting that "after a psychiatric hospitalization earlier in the month, [Plaintiff] stated that he felt 'fine' after his medications and symptoms were stabilized[.]" (*Id.*, citing *id.* at 1602-03.).\ The ALJ further found that Plaintiff's "memory was grossly intact upon examination[,]" and that

"during an examination in March 2020, where the claimant was noted to be taking Naltrexone for his alcohol use, he reported that he now had his "memory back" and that he "exhibited focused concentration upon examination at the time." (*Id.*, citing *id.* at 1908, 2092.) The ALJ observed that "[n]ear discharge during a voluntary psychiatric hospitalization in June 2020, after being on medication and having abstinence from marijuana and alcohol, [Plaintiff] was observed to have appropriate recent and remote memory." (*Id.*, citing *id.* at 1602-03.)

With respect to interacting with others, despite Plaintiff's claims of having difficulties with others and management at his last job, the ALJ noted that Plaintiff was largely cooperative with his examiners when not under the influence of substances and was able to "maintain[] eye contact" and had "generally normal speech, though at time[s] some degree of pressured speech was observed." (*Id.* at 30, citing *id.* at 1564, 1629, 1908, 2087, 2298.) The ALJ also noted that Plaintiff shares a home with his son and spends social time speaking on the phone daily. (*Id.* at 30.)

With respect to concentrating, persisting, and maintaining pace, the ALJ acknowledged Plaintiff's claims in his function report that he had difficulties with completing tasks and concentration in general. (*Id.*, citing *id.* at 335-42.) However, the ALJ cited Plaintiff's activities of daily living demonstrating otherwise, including household chores like general cleaning and laundry. (*Id.*) The ALJ pointed out that Plaintiff drives, shops by mail, and handles his finances. (*Id.*) The ALJ also stated that Plaintiff "spent most of his days watching television, which is an activity that requires some degree of concentration ability" and that "sometimes he would go out walking, including to the mountains." (*Id.*) The ALJ cited objective medical evidence showing that Plaintiff was "largely objectively alert and[] oriented during his examinations, especially when not under the immediate effects of substance abuse and being more treatment compliant in

general, despite his reports of concentration difficulties and sleep problems." (*Id.*, citing *id.* at 1613, 1813, 1817, 2060, 2069, 2087, 2258.) The ALJ concluded that "substance abuse and[] other treatment noncompliance often increased his psychosis symptoms, whereas his thought processes [or] content were more intact during times of no substance abuse and with better treatment compliance in general." (*Id.* at 30.)

Finally, as it relates to adapting or managing oneself, the ALJ acknowledged Plaintiff's self-reports in his function report of emotional dysfunction and an inability to handle stress. (*Id.*, citing *id.* at 335-42.) However, the ALJ found that Plaintiff denied "having any significant problems performing his own personal care tasks" and that record evidence shows that with "periods of general sobriety, and with better treatment compliance in general, [his] mental health treatment was more conservative in nature, and [he] was largely independent in his activities of daily living." (*Id.* at 30-31.) The ALJ concluded that "while [Plaintiff] had [a] long history of abusing substances, he made efforts to stop using, and he also showed that he was able to otherwise take care of himself when sober, as he had improved appearances during times of general sobriety and better treatment compliance; from appearing as disheveled to having at least adequate grooming." (*Id.* at 31, citing *id.* at 1601-07, 1614-17, 1631-40, 1907-09, 1955-56, 2060, 2087, 2091-92, 2257-59, 2267-70.)

Plaintiff did not address the above findings. (*See* Pl.'s Br. at 13-14.) To demonstrate error in an ALJ's step three finding, a claimant must identify "which listing [he] believes [he] meets or equals" and then set forth "evidence which would support the diagnosis and findings of a listed impairment." *Burch*, 400 F.3d at 683. Plaintiff did not address any of the four paragraph B criteria in his argument nor explain how he satisfies them. (*See* Pl.'s Br. at 13-14.) Instead, he points to Dr. Rice's November 13, 2020, treatment notes and argues that he experiences

psychosis absent substance use. (*Id.*, citing *id.* at 2056-57.) Plaintiff fails to connect Dr. Rice's observations with any of the four paragraph B criteria. (*Id.*) Plaintiff's reliance on Dr. Rice's treatment notes alone fails to establish that he meets either Listing 12.04 or 12.15, and the claimant bears the burden of establishing he meets a listing. *See Burch*, 400 F.3d at 683. Plaintiff has not met his burden, and the Court concludes the ALJ did not err in evaluating whether Plaintiff met or equaled a listed impairment.

**b.    Paragraph C Criteria**

The Court also concludes that the ALJ provided an adequate explanation with respect to why Plaintiff did not meet the paragraph C criteria for Listings 12.04 and 12.15. (*See* Tr. 31.) To meet such criteria, there must be a documented history of the existence of the disorder over a period of at least two years and evidence of both a reliance on ongoing treatment to diminish the symptoms and signs of the mental disorder with only marginal adjustment, meaning that the claimant has minimal capacity to adapt to changes in the environment or to demands that are not already part of his daily life. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(G)(2)(a)-(c).

The ALJ stated that the "record does not establish that [Plaintiff] has only marginal adjustment, that is, a minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." (Tr. 31, citing treatment notes showing Plaintiff's improvement with anxiety, sleep, psychosis, and appearance when compliant with treatment.) Plaintiff does not address this finding. Instead, he argues that if the ALJ had properly considered Dr. Rice's medical opinion, his opinion is enough to demonstrate that Plaintiff meets the paragraph C criteria. (*See* Pl.'s Br. at 14.) Without more, however, Plaintiff fails to establish error.

Dr. Rice opined that Plaintiff "requires a controlled stress-free environment, must isolate and avoid others, and would quickly decompensate into an episode of psychosis with the

increased stress of employment[.]" (Tr. 2636-39.) Plaintiff relies on this opinion to argue that he meets the paragraph C criteria but provides no further explanation. (Pl.'s Br. at 13-14.) Plaintiff's argument is unpersuasive for two reasons.

First, Plaintiff fails to explain how Dr. Rice's medical opinion demonstrates marginal adjustment despite treatment. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(G)(2)(a)-(c). Second, Dr. Rice did not provide objective medical evidence supporting his opinion, nor do his statements establish that Plaintiff meets or equals Listings 12.04 and 12.15 under the paragraph C criteria, as Dr. Rice did not address Plaintiff's response to treatment. (*See* Tr. 2639); *see also Key*, 754 F.2d at 1550 (concluding that an ALJ will not consider only a diagnosis of an impairment within a listing, as the findings shown in the listing of that impairment must also be included). The listed impairments have "strict standards" and "are purposefully set at a high level of severity because the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Kennedy*, 738 F.3d at 1176. Plaintiff's reliance on Dr. Rice's medical opinion, without more, fails to establish that he meets either Listing 12.04 or 12.15 under the paragraph C criteria. (*See* Pl.'s Br. at 14.) As a result, Plaintiff has not met his burden and the Court concludes the ALJ did not err at step three.

## II.    MEDICAL OPINION EVIDENCE

Plaintiff argues that substantial evidence does not support the ALJ's reasons for discounting the opinion of Dr. Rice, his treating psychiatrist, in the absence of substance use. (Pl.'s Br. at 8-13.)

///

///

///

///

### A.    Applicable Law

"In January 2017, the Social Security Administration issued revised regulations for evaluating medical opinions relating to claims filed on or after March 27, 2017."[4] *Cross v. O'Malley*, 89 F.4th 1211, 1214 (9th Cir. 2024) (citation omitted). The revised "regulations provide that ALJs will no longer 'defer or give any specific evidentiary weight' to any medical opinions." *Id.* (quoting 20 C.F.R. § 416.920c(a)). Instead, "ALJ[s] must assess the persuasiveness of each medical opinion after considering specified factors." *Stiffler v. O'Malley*, 102 F.4th 1102, 1106 (9th Cir. 2024) (first citing *Woods v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022); and then citing 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(b)).

Specifically, the revised "regulations require an ALJ to discuss the supportability and consistency of medical evidence—the factors the agency has historically found to be the most important in evaluating medical opinions—while allowing for discussion of other factors listed in paragraphs (c)(3) through (c)(5), as appropriate." *Cross*, 89 F.4th at 1215 (citing 20 C.F.R. § 416.920c(a)); *see also Woods*, 32 F.4th at 791 ("'The most important factors' that the agency considers when evaluating the persuasiveness of medical opinions are 'supportability' and 'consistency.'" (quoting 20 C.F.R. § 404.1520c(a))). "Supportability focuses on whether 'a medical source supports a medical opinion by explaining the relevant objective medical evidence.'" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 791-92); *see also Kitchen v. Kijakazi*, 82 F.4th 732, 740 (9th Cir. 2023) ("Supportability concerns how 'a medical source supports a medical opinion' with relevant evidence[.]" (quoting *Woods*, 32 F.4th at 791-92)). "Consistency means the extent to which a medical opinion is consistent with the evidence from

---

[4] The parties agree that the revised regulations apply here because Plaintiff filed his application after March 27, 2017. (*See* Pl.'s Br. at 8; Def.'s Br. at 13-14, ECF No. 18.)

other medical sources and nonmedical sources[.]" *Stiffler*, 102 F.4th at 1106 (quoting *Woods*, 32 F.4th at 792).

In addition to supportability and consistency, "[a]n ALJ may discuss other factors [listed in paragraphs (c)(3) through (c)(5)], such as the medical source's 'relationship with the claimant' or 'specialization,' but generally has no obligation to do so." *Cross*, 89 F.4th at 1214 (citing 20 C.F.R. § 416.920c(b)(2)). If, however, an "ALJ finds two or more contradictory medical opinions 'both equally well-supported . . . and consistent with the record[,]'" "the regulations mandate discussion of these other factors[.]" *Id.* at 1214-15 (quoting 20 C.F.R. § 416.920c(b)(3), (c)(3)-(5)).

A district court reviews the ALJ's evaluation of a medical opinion for substantial evidence. *See Woods*, 32 F.4th at 787 ("Now, [under the new regulations,] an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence."); *id.* at 792 ("Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."); *Metcalf v. Kijakazi*, No. 22-35201, 2022 WL 17592194, at *1 (9th Cir. Dec. 13, 2022) (observing that "under the revised regulations . . . , the ALJ's evaluation of a medical opinion is reviewed for substantial evidence" (citing *Woods*, 32 F.4th at 789)).

### B.    Analysis

The Court concludes that the ALJ did not commit harmful error in evaluating Dr. Rice's medical opinion.

### 1.    Dr. Rice's Opinion

On March 13, 2024, Dr. Rice completed a mental RFC assessment, assessing Plaintiff with severe limitations in the following basic work activities: (1) the ability to perform activities

within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) the ability to work in coordination with or proximity to others without being distracted by them; (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) intermittently, the ability to accept instructions and respond appropriately to criticism from supervisors; (5) intermittently, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) intermittently, the ability to set realistic goals or make plans independently of others. (Tr. 2636-37.)

Dr. Rice also assessed extreme limitations "intermittently" in the four paragraph B criteria and found that Plaintiff's impairments and limitations established the presence of the paragraph C criteria. (*Id*. at 2638.) Dr. Rice determined that Plaintiff would be off-task over thirty percent of a forty-hour workweek, and that he would miss four or more days of work per month. (*Id*. at 2639.) Dr. Rice explained that Plaintiff is very fragile and must maintain a rigorous program of mental health hygiene, which includes close monitoring of medications and a stress-free environment, and that he "sinks extremely fast" into psychosis when one of his conditions deteriorates. (*Id*.) Finally, Dr. Rice concluded, "I have strongly advised that he not work[,] as the odds of a mental health deterioration [are] much higher [with] employment." (*Id*.)

### 2.    The ALJ's Findings

The ALJ found that Dr. Rice's opinion was unpersuasive when not taking Plaintiff's substance use or "other gross noncompliance" into account. (*Id.* at 36.) The ALJ noted that Dr. Rice's opinion offered minimal narrative explanation for the extensive limitations he expressed, and that his opinion was "vague" because he did not "articulate specific mental functional limitations that outlined [Plaintiff]'s maximum mental abilities." (*Id*.) The ALJ took issue with

PAGE 17 – OPINION AND ORDER

the fact that Dr. Rice wrote the word "intermittently" many times throughout the form without explanation. (*Id*., *see id.* at 2637-38.) The ALJ also noted that the opinion did not "clearly separate out [Plaintiff]'s mental health functioning during periods of substance abuse[.]" (*Id.* at 36-37.)

### 3.    Disposition

The Court concludes that substantial evidence supports the ALJ's evaluation of Dr. Rice's opinion.

The Court agrees that Dr. Rice's opinion does not "clearly separate out [Plaintiff]'s mental health functioning during periods of substance abuse[,]" even though his treatment notes did. (*Id.* at 36.) For example, when not using substances, Dr. Rice's treatment notes discuss how "revolutionized" Plaintiff's recovery had become and that he responded well to his medications and bipolar treatment plan. (*Id.* at 2618; *see also id.* at 2602, 2622, "if he is not drinking and drugging that he will remain stable on lithium alone"; *id.* at 2612, "Patient reports mood is much more stable on lurasidone in addition to the lithium. No psychosis. Much of session was spent on why neurophysiological [] abstinence from all drugs is his only safe path . . . thought content notable for the absence of psychosis and paranoia.") The record also reflects several unremarkable mental status exams when not using substances, showing that Plaintiff's "mood [ha]s remained stable" and "[s]leep is good." (Tr. 2618; *see also id.* at 2616, "Patient reports that he is doing very well he feels that his PTSD is well controlled and not something he currently needs to work on"; *id.* at 2618, 2622, 2624, "Friendly and cooperative good eye contact, speech and psychomotor activity unremarkable, affect broad and reactive, mood euthymic, thought processes logical coherent, thought content unremarkable, cognition normal to interview.")

On the other hand, Plaintiff's sessions with Dr. Rice also reflect that when he was using substances, his mental health deteriorated. (*See, e.g.*, *id.* at 2614, "Patient reports an out of

[four]-day meth run followed by [three] days of severe withdrawal . . . affect hypomanic-expansive and labile, mood hypomanic, thought processes mildly tangential, thought content notable for overvalued ideas"; *id.* at 2594, "He is clean from methamphetamine and opiates which have thrown him [into] severe manic episodes in the past.") In reviewing the record, the Court agrees that Dr. Rice's own treatment notes do not support the extensive limitations set forth in his opinion, nor does his opinion capture the full picture and complexity of how Plaintiff's substance use triggers his more extreme mental health limitations. Accordingly, the Court concludes that the ALJ's evaluation of the supportability factor of Dr. Rice's opinion was reasonable and supported by substantial evidence.

The ALJ also found that Dr. Rice's opinion that employment would exacerbate Plaintiff's "mental health decompensations" was inconsistent with other record evidence showing instead that "substance abuse [or] other significant treatment noncompliance" was the root cause of Plaintiff's mental health impairments. (*Id.* at 37, citing *id.* at 2269, "Psychosis due to prolonged history of methamphetamine, cannabis and alcohol use. Prognosis is very poor if he does not ab[s]tain or is noncompliant with medications"; *see also id.* at 1601-07, 1614-17, 1631-40, 1907-09, 1955-56, 2060, 2087, 2091-92, 2257-59, 2267-70.) Further, there appears to be no record evidence, and Dr. Rice cites none, supporting a conclusion that employment would trigger Plaintiff's more extreme mental impairments. When evaluating a medical opinion's consistency, the ALJ must consider consistency with other medical and nonmedical sources. *See* 20 C.F.R. § 416.920c(c)(2). The ALJ did so here, and substantial evidence supports his evaluation of Dr. Rice's opinion.

Plaintiff does not address the ALJ's findings but instead asserts that the ALJ "fail[ed] to offer any evaluation of the record evidence." (Pl.'s Br. at 10, *but see* Tr. 36-37.) Plaintiff cites

four examples in the record that he argues show that Dr. Rice's assessment is supported by and consistent with the available evidence in the absence of substance use. (Pl.'s Br. at 10, citing Tr. 2050, 2056-57, 2059, 2251.) Plaintiff's argument is unpersuasive for three reasons.

First, the October 14, 2020 and November 13, 2020 treatment notes that Plaintiff cites do not demonstrate that he was abstaining from substance use around this time. Just a few weeks prior, a September 30, 2020, treatment note reflects that Plaintiff "now admits he has been using methamphetamine again and would not ascertain when his last use was." (*Compare* Tr. 2058 *with* Tr. 2056-57, 2059.) This contemporaneous treatment note, paired with evidence that Plaintiff could not be contacted after November 2020, casts doubt that any of these treatment notes are "evidence in the absence of substance use." (Pl.'s Br. at 10; *see* Tr. 2054-56.)

Second, although Plaintiff relies on a treatment note from April 20, 2021, to assert that "a crisis note showed homicidal ideation and suicidal ideation[,]" this is not entirely accurate. (Pl.'s Br. at 11; *see also* Pl.'s Reply Br. at 4, ECF No. 19.) In fact, the treatment note stated that Plaintiff "responded, was calm and reported he was not in any distress denying any thoughts of not wanting to live or to hurt himself or anyone else."[5] (Tr. 2050.)

Third, Plaintiff is essentially asking the Court to reinterpret the evidence in a light more favorable to him, but the Court cannot do so because even if "evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch*, 400 F.3d at 679. Given Dr. Rice's findings, Plaintiff's own reports to his providers, and generally normal and improved findings in the record when Plaintiff was not using substances and was complying

---

[5] Rather, Plaintiff's mother told a clinical social worker that Plaintiff is "experiencing both HI [Homicidal Ideation] and SI [Suicidal Ideation] and housing concerns[,]" but Plaintiff "gave no indication of being in distress or even moderate stress" during the call with the clinical social worker. (Tr. 2050.)

with treatment, the ALJ reasonably found that Dr. Rice's opinion was inconsistent with and not supported by the record. The Court finds that the ALJ did not commit harmful error in evaluating Dr. Rice's opinion.

## III.    SUBJECTIVE SYMPTOM TESTIMONY

Plaintiff argues that the ALJ erred by discounting his subjective symptom testimony. (Pl.'s Br. at 14-17; Pl.'s Reply Br. at 8-10.) Defendant responds that substantial evidence supported the ALJ's evaluation of Plaintiff's symptoms. (Def.'s Br. at 10-13.)

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted).

### B.    Analysis

There is no evidence of malingering here and the ALJ determined that Plaintiff provided objective medical evidence of underlying impairments which might reasonably produce the symptoms alleged. (Tr. 22.) The ALJ was therefore required to provide clear and convincing reasons for discounting Plaintiff's symptom testimony. *See Ghanim*, 763 F.3d at 1163. The ALJ met that standard here.

### 1. Plaintiff's Testimony

Plaintiff testified that he is unable to work due to his Bipolar Type I Disorder and PTSD. (*See generally* Tr. 64-72.) Plaintiff claimed to have suffered from manic episodes for four days in a row, during which he suffered from auditory hallucinations and was extremely limited, and sometimes he would have one day here and there with severe symptoms and an inability to work. (*Id.* at 63-64.) Plaintiff also attempted to keep a "really low stress lifestyle." (*Id*. at 64.) He testified that he has "trouble comprehending" as well as reading, and prefers to stay in his room even when his son is around. (*Id*. at 65.) Plaintiff is easily irritated and sleeps a lot from his medications. (*Id*. at 66-67.) He becomes triggered when told what to do or criticized, resulting in walking off his last job. (*Id*. at 73.) He also testified to increased symptoms of catatonia or mania on the day following poor sleep, which can sometimes result in psychosis. (*Id*. at 73-74.) In his adult function report, Plaintiff refused to describe what he normally does during the day (*see id.* at 336, "Describe what you do from the time you wake up until going to bed." "No"), reported difficulty sleeping when manic, usually buys his meals and does chores, goes outside daily "unless manic or depressed," shops by mail, walks outside, watches television, handles money, speaks on the phone daily, and gets along well with others when not psychotic or manic. (*See id*. at 336-40.)

### 2. The ALJ's Evaluation of Plaintiff's Testimony

The ALJ discounted Plaintiff's symptom testimony on the grounds that Plaintiff's symptom severity was inconsistent with his documented improvements when sober and adhering to treatment, the objective medical evidence, and Plaintiff's activities of daily living.[6] (*Id*. at 31-34.)

---

[6] Plaintiff does not challenge the ALJ's discounting of his symptom testimony as inconsistent with the objective medical evidence. (*See* Pl.'s Br. at 15-17.) Plaintiff neither rebuts

### 3.    Disposition

The Court finds that the ALJ provided clear and convincing reasons, supported by substantial evidence in the record, to discount Plaintiff's testimony.

#### a.    Improvement with Treatment and Abstinence from Substances

Plaintiff argues that the ALJ failed to provide clear and convincing reasons supported by substantial evidence for discounting his testimony based on his improvement with treatment, medication, and abstinence from substance use. (*See* Pl.'s Br. at 16-17.)

An ALJ may discount a claimant's testimony based on evidence that the claimant's symptoms improved with treatment or medication. *See Walker v. Kijakazi*, No. 22-35351, 2023 WL 3017946, at *1 (9th Cir. Apr. 20, 2023) (concluding that the ALJ had provided specific, clear, and convincing reasons for discounting the plaintiff's subjective symptom testimony where substantial evidence demonstrated that the plaintiff's pain improved with treatment and medication); *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) ("[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability.") (citations omitted).

For example, in *Burkett v. Saul*, 806 F. App'x 509, 512 (9th Cir. 2020), the Ninth Circuit held that the ALJ provided clear and convincing reasons for discounting the claimant's symptom testimony, and in doing so, noted that the ALJ appropriately found that the claimant's testimony was inconsistent with, *inter alia*, "record evidence that her depression [was] well controlled (when on medication regularly)." *Id.* (simplified); *see also Darling v. Kijakazi*, No. 22-35594,

---

the ALJ's findings nor points to any objective medical evidence that calls the ALJ's findings into question. The Court does not consider matters that are not "specifically and distinctly" argued in the plaintiff's opening brief. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (quoting *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003)).

2023 WL 4103935, at *2 (9th Cir. June 21, 2023) (holding that the ALJ provided clear and convincing reasons to discount the claimant's symptom testimony, including "treatment efficacy[] and longitudinal improvement"); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (explaining that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits").

The ALJ discounted Plaintiff's testimony regarding the severity of his mental health symptoms in part because the medical record reflects that Plaintiff's symptoms improved with therapy, medication, and abstinence from substance use. (Tr. 32-33.) This was a clear and convincing reason to discount Plaintiff's symptom testimony. *See, e.g., Gerard C. v. O'Malley*, No. 23-cv-00018-JLB, 2024 WL 1298009, at *7 (S.D. Cal. Mar. 26, 2024) (holding that the ALJ appropriately "relied upon evidence that Plaintiff improved with medication and other treatment in discounting Plaintiff's symptom testimony" where "the records from both within and beyond the insured period demonstrate improvement of Plaintiff's anxiety and panic attacks with medication and therapy"); *see also Dennis R. v. Saul*, No. C19-5577-MAT, 2020 WL 1987074, at *2 (W.D. Wash. Apr. 27, 2020) (holding that treatment notes showing normal mental status exams with the plaintiff's bipolar disorder in remission was "substantial evidence supporting the ALJ's finding that plaintiff's impairments were no longer disabling in the absence of substance abuse").

The ALJ's observation that Plaintiff's symptoms improved with therapy, medication, and abstinence from substance use is supported by substantial evidence in the record. For example, the ALJ considered Plaintiff's history of inpatient psychiatric hospitalizations and outpatient counseling but found that "his psychiatric hospitalizations and mental decompensations in

general, largely had recent substance abuse as a factor and[] other gross noncompliance with treatment recommendations, such as not taking medications appropriately." (Tr. 33, citing several treatment notes.) The ALJ also noted that when Plaintiff was not using substances and had better treatment compliance, he showed "improved cognitive abilities," citing three examples from February, March, and June 2020. (*See id.*, citing *id.* at 1602-03, 1908, 2091.) The ALJ also cited examples post-dating Plaintiff's alleged onset date, comparing Plaintiff's extreme level of psychosis resulting from ongoing substance use with a normal status exam when compliant with medication. (*Id.*, citing *id.* at 2060, a treatment note from October 1, 2020, noted "Psychosis due to prolonged and apparently ongoing methamphetamine, cannabis and alcohol use"; *id.* at 1813, a March 9, 2021, treatment note reflected a normal mental status exam after an ankle injury, affirming with his providers that he was compliant with his medication regimen).

Plaintiff takes issue with these findings for three reasons. First, Plaintiff argues that the ALJ "primarily cited records prior to the relevant time period." (Pl.'s Br. at 15-16.) Second, Plaintiff contends that the ALJ failed to consider the side effects of his prescribed medication. (*Id.*) Third, Plaintiff argues that the ALJ pointed only to isolated signs of improvement and did not properly consider that mental health symptoms typically wax and wane. (*Id.*)

First, an ALJ considers "all evidence in [the] case record" when determining whether an applicant is disabled, which may include evidence from outside the period of disability. *See* 20 C.F.R. § 404.1520(a)(3). Although evidence outside the disability period is often "of limited relevance," *Carmickle*, 533 F.3d at 1165, it can provide additional context where, as here, Plaintiff alleges his mental health is completely disabling even when not using substances. The ALJ did not base his decision solely on the early 2020 medical record, but considered those portions of the record to evaluate the symptom pattern related to Plaintiff's substance use and

resulting hospitalizations, in conjunction with the only available treatment notes discussing that he was less "mentally limited when not abusing substances" and had "improved cognitive abilities" when compliant with treatment. (Tr. 33, citing treatment notes reflecting normal mental status examinations and noting that therapy and treatment "has been helpful" and restored Plaintiff's memory.) Plaintiff fails to address the ALJ's discussion of treatment notes from *after* the alleged onset date, and he does not point the Court to any record evidence within the short period of disability (September 10, 2020 to March 31, 2021) that calls the ALJ's analysis into question. (*See generally* Pl.'s Br. at 15-16.) The Court finds that the ALJ did not err by considering medical records that pre-dated the alleged period of disability.

Second, Plaintiff argues the ALJ failed adequately to consider his side effects of "severe sleepiness and daily napping [or] dozing off." (Pl.'s Br. at 17.) However, Plaintiff cites only to his own hearing testimony as evidence of these allegations. (*Id.*, citing Tr. 62-74, 79-82.) In addition, Plaintiff does not acknowledge that the ALJ considered Plaintiff's subjective complaints regarding his medication side effects. (*See* Tr. 23, 25.) Plaintiff has not demonstrated that the ALJ erred in failing to discuss his medication side effects. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (finding no error in an ALJ's failure explicitly to address the drowsiness side effect of a claimant's medications where "[i]n making his RFC determination, the ALJ took into account those limitations for which there was record support that did not depend on [the claimant's] subjective complaints"); *Roquemore v. Comm'r of Soc. Sec. Admin.*, 374 F. App'x 693, 695 (9th Cir. 2010) (finding that an ALJ did not err in failing to discuss medication side effects where the plaintiff "fails to identify any objective evidence of side effects" and "points only to his own subjective claims of drowsiness and decreased concentration").

Third, Plaintiff argues that the ALJ's findings of improvement ignored the fact that his mental health symptoms waxed and waned. (*See* Pl.'s Br. at 16.) Plaintiff relies on *Garrison* in support of his argument that "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." 759 F.3d at 1017-18. While true, the ALJ reasonably identified the pattern of Plaintiff's mental health improvement when not under the influence of drugs or alcohol and explained those implications throughout his decision. (*See* Tr. 29-33.) Plaintiff does not cite to any record evidence that calls into question the ALJ's analysis of Plaintiff's testimony and ultimately his RFC. At best, Plaintiff seeks an alternative interpretation of the record, which is an improper ground for reversal. *See Burch*, 400 F.3d at 680-81 ("Although the evidence of [the claimant]'s daily activities may also admit of an interpretation more favorable to [the claimant], the ALJ's interpretation was rational, and '[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'") (citation omitted).

For these reasons, the Court finds that the ALJ cited clear and convincing reasons, supported by substantial evidence, to discount Plaintiff's symptom testimony due to his improvement with treatment, medication compliance, and abstinence from substance use.

### b.    Activities of Daily Living

Plaintiff argues that the ALJ erred by discounting Plaintiff's symptom testimony as inconsistent with his activities of daily living. (*See* Pl.'s Br. at 16.)

An ALJ may discount a claimant's symptom testimony based on activities that are incompatible with the claimant's testimony regarding the severity of her symptoms. *See Burrell v. Colvin*, 775 F.3d 1133, 1137-38 (9th Cir. 2014) (explaining that "[i]nconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination" (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)));

PAGE 27 – OPINION AND ORDER

*Garrison*, 759 F.3d at 1016 (stating that a claimant's activities have "bearing on [the claimant's] credibility" if the reported "level of activity" is "inconsistent with [the claimant's] claimed limitations" (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998))). Notably, there must be a meaningful inconsistency between the claimant's daily activities and the symptom testimony. *See Harris v. Kijakazi*, No. 21-35136, 2022 WL 1262011, at *1 (9th Cir. Apr. 28, 2022) (holding that the ALJ committed harmful error in discounting the plaintiff's symptom testimony and explaining that the plaintiff's "limited daily activities were not meaningfully inconsistent with her symptom testimony" (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

The Court finds that the ALJ properly discounted Plaintiff's symptom testimony as inconsistent with his activities. The ALJ found that Plaintiff's activities of daily living do not fully support his subjective complaints "especially when not abusing alcohol and otherwise being more treatment compliant." (Tr. 32.) The ALJ gave examples, such as Plaintiff preparing "at least simple meals, such as TV dinners," "household chores, such as general cleaning and laundry," driving a car, "shopping by mail," and "handl[ing] his money [and] finances[.]" (*Id.*) The ALJ further explained that Plaintiff indicated that "he spent most of his days watching television, which is an activity that requires some degree of concentration ability." (*Id.*) The ALJ noted that sometimes Plaintiff "would go out walking, including to the mountains, despite his reports of having anxiety when outside of the home for a long period." (*Id.*) Finally, the ALJ noted that Plaintiff shared his home with his teenage son, "despite indicating that his son's actions were a trigger for his PTSD," "reported that he spent social time talking on the phone on a daily basis," and "denied having any significant problems performing his own personal care tasks." (*Id.*)

Plaintiff argues that the ALJ "overlooked" that Plaintiff must "frequently isolate in his home and avoid others[,]" and the fact that he can do some level of activity should not result in a finding that he can perform typical work responsibilities. (Pl.'s Br. at 16, citing *Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017).) However, as discussed above, an ALJ may discount a claimant's symptom testimony based on activities that are incompatible with the claimant's testimony regarding the severity of his symptoms. The Court finds that the ALJ's reliance on Plaintiff's activities to discount his symptom testimony was supported by substantial evidence because the records on which the ALJ relied were inconsistent with Plaintiff's allegations of completely disabling symptoms. For these reasons, the Court finds that the ALJ did not err in evaluating Plaintiff's symptom testimony.

## IV.  STEP FIVE

Plaintiff argues that the ALJ failed to reconcile an apparent conflict between his RFC and the reasoning and supervisory requirements of the jobs the ALJ identified at step five. (*See* Pl.'s Br. at 17-19.)

### A.  Applicable Law

At step five, the Commissioner has the burden "to identify specific jobs existing in substantial numbers in the national economy that a claimant can perform despite his identified limitations." *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015) (simplified) (first quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995); and then citing 20 C.F.R. § 416.920(g)) (simplified).

The ALJ "first assesses a claimant's 'residual functional capacity,' defined as the most that a claimant can do despite 'physical and mental limitations' caused by his impairments and related symptoms." *Id.* (quoting 20 C.F.R. § 416.945(a)(1)). The ALJ "then considers potential occupations that the claimant may be able to perform." *Id.* (citing 20 C.F.R. § 416.966). In

making this determination, "the ALJ relies on the [Dictionary of Occupational Titles ("DOT")], which is the SSA's 'primary source of reliable job information' regarding jobs that exist in the national economy." *Id.* at 845-46 (first quoting *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990); then citing 20 C.F.R. § 416.969; and then citing 20 C.F.R. § 416.966(d)(1)). The DOT "describes the requirements for each listed occupation, including the necessary General Educational Development ('GED') levels; that is, 'aspects of education (formal and informal) . . . required of the worker for satisfactory job performance.'" *Id.* at 846 (citing DOT, App. C, 1991 WL 688702 (4th ed. 1991)). "The GED levels includes the reasoning ability required to perform the job, ranging from Level 1 (which requires the least reasoning ability) to Level 6 (which requires the most)." *Id.* In addition to the DOT, "the ALJ relies on the testimony of vocational experts who testify about specific occupations that a claimant can perform in light of his residual functional capacity." *Id.* (first citing 20 C.F.R. § 416.966(e); and then citing *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009)).

Finally, "to conclude the Step Five analysis, the ALJ determines 'whether, given the claimant's [RFC], age, education, and work experience, he actually can find some work in the national economy.'" *Id.* (first quoting *Valentine*, 574 F.3d at 689; and then citing 20 C.F.R. § 416.920(g)).

### B.    The ALJ's Findings

The ALJ found at step five that if Plaintiff "stopped the substance use, considering [his] age, education, work experience, and [RFC], there have been jobs that exist in significant numbers in the national economy that [he] can perform." (Tr. 38.) Such jobs include janitor, hand packager, and automobile detailer. (*Id.*)

///

///

C.      **Analysis**

The Court concludes that the ALJ did not err at step five.

Plaintiff argues that the jobs identified at step five are in apparent conflict with the ALJ's RFC determination because he limited Plaintiff to simple, routine, and repetitive tasks. (Pl.'s Br. at 18.) Plaintiff argues that a simple or routine task limitation conflicts with GED Level Two reasoning, relying on a dated case in which the Eighth Circuit held that a limitation to simple or routine tasks is inconsistent with Level Two reasoning. (*See id*., citing *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997).) However, the Ninth Circuit has held that a claimant's ability to perform "simple" and "routine" tasks is consistent with GED Reasoning Level Two.[7] *See, e.g.*, *Zavalin*, 778 F.3d at 846-47 (finding that Level Two reasoning is more consistent with a limitation to "simple, routine, or repetitive work" than Level Three reasoning); *Lara v. Astrue*, 305 F. App'x 324, 326 (9th Cir. 2008) ("[S]omeone able to perform simple, repetitive tasks is capable of . . . Reasoning Level 2 jobs."); *Abrew v. Astrue*, 303 F. App'x 567, 569 (9th Cir. 2008) ("[T]here was no conflict between the ALJ's step five determination that [the claimant] could complete only simple tasks and the [VE]'s testimony that [the claimant] could do jobs . . . categorized at 'Reasoning Level 2.'"); *Coleman v. Astrue*, No. CV 10-5641 JC, 2011 WL 781930, at *5 (C.D. Cal. Feb. 28, 2011) ("[T]he weight of prevailing authority precludes a

---

[7] The Ninth Circuit has found a conflict with Level Two reasoning when a claimant is limited to "*short*" and simple instructions, but here Plaintiff was not limited to "short" instructions, but only to "simple" and "routine" tasks. *See Leach v. Kijakazi*, 70 F.4th 1251, 1257 (9th Cir. 2023) ("We hold only that, because the ALJ omitted the qualifying adjective "short" when posing the question to the vocational expert, thereby describing a hypothetical person with greater functional capacity than [the c]laimant possesses, the ALJ erred by relying on the vocational expert's testimony, and the error was not harmless."); *see also Isaiah L. v. Comm'r Soc. Sec.*, No. 6:24-cv-02081-AR, 2025 WL 2910190, at *3 (D. Or. Oct. 14, 2025) ("In *Leach*, the court explained that a limitation to simple, one-or-two step instructions was more consistent with jobs at reasoning level one, while a limitation to 'simple routine tasks' was more consistent with reasoning level two." (citing *Leach*, 70 F.4th at 1256-57)).

finding of any inconsistency between a reasoning level of two and a mere limitation to simple, repetitive tasks or unskilled work.").

The three jobs that the ALJ identified at step five require GED Reasoning Level Two. *See* Janitor (DOT #381.687-018); Hand Packager (DOT #920.587-018); Automobile Detailer (DOT #915.687-034). As a result, the ALJ appropriately identified jobs that are consistent with Plaintiff's ability to perform simple or routine tasks.

Plaintiff also argues that occasional interaction with supervisors bars all job training and, consequently, precludes all competitive employment. (*See* Pl.'s Br. at 17-18.) Plaintiff assumes, without citing relevant authority or evidence, that all jobs require more than occasional interaction with a supervisor during the early stages of employment. (*Id.*) The VE's earlier testimony—that jobs exist in the national economy that require only occasional interaction with coworkers and supervisors—belies Plaintiff's argument. (*See* Tr. 76-77.) The Court finds that the ALJ reasonably relied on the VE's expert opinion, and that the ALJ's step five analysis is supported by substantial evidence.

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

**IT IS SO ORDERED.**

DATED this 4th day of February, 2026.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge